2003 OK 48

**Cynthia Jo HOLLEYMAN, now Ward, Plaintiff/Appellant,**

v.

**Randall Dexter HOLLEYMAN, Defendant/Appellee.**

No. 95,584.

Supreme Court of Oklahoma.

May 13, 2003.

Rehearing Denied June 26, 2003.

Supplemental Opinion on Denial of Rehearing Oct. 14, 2003.

Jim Pearson, Oklahoma City, OK, for Plaintiff/Appellant.

William E. Liebel, James T. Gorton, Oklahoma City, OK, for Defendant/Appellee.

SUMMERS, J.

¶ 1 Our question involves the enforceability of a divorce decree by which the parties purport to agree "to leave the child support open after the minor child reaches the age of eighteen and/or complete high school ..."

based on the needs of the child, if any. The parties agree that the child is a "special needs" child with some degree of retardation and seizure problems.

¶2 Mother and Father divorced in 1993 when their child was fifteen years old. Father stopped providing medical insurance in 2000. Mother then sought an order from the District Court to (1) compel Father to provide medical insurance, (2) pay additional child support, (3) reimburse Mother for payments made to maintain the insurance and for medical expenses, (4) pay child support payments that were unpaid since 1999, and (5) adjudicate future support amounts needed by the child. She alleged that at the time of the divorce the parties agreed that Father would provide support after the child was 21 years old.

¶3 Father responded to Mother's application with a motion to dismiss. He stated that he stopped making the child support payments in May of 1999 after the child graduated from high school at the age of 21 years. He argued that the District Court was without jurisdiction to order payments to support a child after the child has reached the age of 21 years.

¶4 The trial court heard argument of counsel and granted the motion to dismiss. Mother appealed and the judgment was affirmed by the Court of Civil Appeals. We vacate the opinion of the Court of Civil Appeals and reverse the judgment of the District Court.

¶5 The Father maintains that the decree is not a judgment by consent, or "consent decree." We have discussed the characteristics of a consent decree:

A consent judgment is the **agreement of the parties** entered upon the record with the sanction of the court. *McRary v. McRary,* 228 N.C. 714, 719, 47 S.E.2d 27, 31 (1948). A consent decree in a divorce is **the result of negotiations between the parties and subsequent settlement of the issues** involved, which settlement is then presented to the court as a proposed judgment. Although it is not a judicial determination of the rights of the parties, it acquires the status of a judgment through

the approval of the judge of the pre-existing agreement of the parties.
*Whitehead v. Whitehead,* 1999 OK 91, ¶9, 995 P.2d 1098, 1101, (note omitted and emphasis added).

Father's brief describes the events leading up to the decree: "After the parties had been litigating the trial for a matter of days, settlement discussions ensued between the parties and their respective counsel that led to the Journal Entry Order and Decree of Divorce...." The record supports this description in that the decree states that the parties agreed to the provisions of the divorce decree "with regard to all issues." Decree of Divorce, O.R. at 9. The decree is a judgment by consent or a "consent decree."

¶6 Of course, characterizing the decree as a consent decree does not determine that the parties agreed to a particular matter. The controversy in the trial court centered on one provision of the 1993 divorce decree. It states that:

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED by the Court that the Defendant shall pay child support in the amount of Four Hundred Dollars ($400.00) per month, deviated from the child support guidelines, attached hereto as Exhibit "A", as agreed upon by the parties. Due to the special needs of the minor child, the parties have agreed to leave the child support open after the minor child reaches the age of eighteen (18) and/or completes high school, and the Court will retain jurisdiction for either party to file an application for further support based upon the specific needs and requirements of the minor child, if any.
*Id.* O.R. at 11.

Mother claims that the trial court has jurisdiction to order more child support because of Father's agreement. Father claims that a District Court has no subject matter jurisdiction to compel child support payments for the support of children after they have reached the age of 21 years, and that subject matter jurisdiction cannot be created by an agreement of parties.

¶7 We have said that a parent has a legal duty to support his or her child until

the child reaches the age of majority. *State, ex rel. Dept. of Human Services ex rel. Jones v. Baggett,* 1999 OK 68, ¶ 22, 990 P.2d 235, 244; *Abrego v. Abrego,* 1991 OK 48, 812 P.2d 806, 811. The divorce decree in this case was pronounced on June 17, 1993, and the relevant statute in effect at that time stated that:

> Any child shall be entitled to support by the parents until the child reaches eighteen (18) years of age. If a dependent child is regularly and continuously attending high school, said child shall be entitled to support by the parents through the age of eighteen (18) years.

43 O.S.Supp.1993 § 112(D), (eff. June 7, 1993).

Thus, at the time of the decree this statute-based obligation for child support did not extend beyond the child's nineteenth birthday. *Id.*

¶ 8 But the decree in this case is a consent decree, and parties to a consent decree may agree to obligations between themselves that exceed those required by law.

> If the agreement between the parties regarding support and maintenance is intended as final and binding, leaving nothing for determination by the court on the question of the amount of the allowance, such decree is not subject to modification without the consent of both parties. Stuart, 1976 OK 107, ¶ 14, 555 P.2d at 615. **Such an agreement between the parties is enforceable and valid even though it does what a trial court cannot do,** provided the agreement does not contravene public policy.

*Whitehead v. Whitehead,* 1999 OK 91, ¶ 10, 995 P.2d 1098, 1101, (emphasis added). Thus, when a trial court is requested to enforce a child-support obligation upon a parent an important issue must be addressed: What is the source of that obligation? Does the obligation spring from mandatory law or does it spring from a consensual agreement? We noted this distinction in *Greeson v. Greeson,* 1953 OK 111, 257 P.2d 276.

¶ 9 In *Greeson* we observed that a trial court did not possess statutory power to modify child support retroactively, but the

parties could agree to such modification and incorporate such agreement in a judgment by consent. We explained that such a consent decree was judicially enforceable.

With this contention we agree. Under 12 O.S.1941 § 1277 the court has authority to modify an order for child support prospectively. The court does not have authority to make the modifying order operate retroactively. *Sango v. Sango,* 121 Okl. 283, 249 P. 925; *Reynolds v. Reynolds,* 192 Okl. 564, 137 P.2d 914. Therefore, if the order of December 21, 1946 had been entered by the court upon the merits after a trial of the issues it would have been void insofar as it had the effect of relieving the defendant of liability for unpaid installments accrued up to the time of the entry of the order.

However, it is agreed that the order of December 21, 1946 was a consent order entered by the court upon the agreement and consent of the parties. **While in its retroactive aspect it is void as a court order, yet being a consent order, it is in the nature of a contract, and in the absence of fraud or mistake, is a binding obligation between the parties thereto.**

*Greeson v. Greeson,* 257 P.2d at 278. (emphasis added)

Just as parties may consent to a retroactive adjustment of their personal rights, they may also contract as to their personal rights in the future. For example, in *Kittredge v. Kittredge,* 1995 OK 30, 911 P.2d 903, we explained that a consent decree awarding the wife a percentage of the husband's future income in lieu of property division was enforceable, even though the statute would otherwise have prohibited an order to that effect:

> The husband argues the trial court did not have the jurisdictional power to divide his future earnings because the consent of his rights even though he consented to the division. In *Ettinger v. Ettinger,* 637 P.2d 63, 65 (Okla.1981), this Court held that under section 1278 of title 12 of the Oklahoma Statutes (now Okla.Stat.tit. 43 § 121), a district court did not have jurisdiction to divide a husband's future earning absent a recitation in the decree the

parties intended to circumvent the statute. The Court, however, recognized that where the parties had entered into a consent agreement which sought to avoid the strictures of the statute, the district court would have jurisdiction to enter such an order. Further, an express waiver of statutory rights in the consent decree was not required, only an agreement "which seeks to avoid the strictures of Section 1278." *Kittredge v. Kittredge*, 911 P.2d at 904. Thus, the parties may, as a general proposition, agree between themselves as to future child support payments.

¶10 Father further argues that a "consent decree may not leave anything for determination by the trial court." He relies upon language in Whitehead stating that: "If the agreement between the parties regarding support and maintenance is intended as final and binding, **leaving nothing for determination by the court on the question of the amount of the allowance,** such decree is not subject to modification without the consent of both parties." *Whitehead v. Whitehead*, 1999 OK 91, at ¶10, 995 P.2d at 1101, emphasis added. This language addresses the finality of an obligation, and not whether the amount of an obligation may be contractually set for a future determination. We have allowed consent decrees to possess obligations where the amount thereof is determined at a future date. *Kittredge v. Kittredge, supra.*

¶11 Once we recognize that parties may agree to alter their obligations the next steps are determining if such agreement did occur and the substance of the agreement. We use principles of contract law to make these determinations. We have said that we construe a consent judgment "as other contracts" and ascertain the intent of the parties.

> An agreed judgment is in the nature of a contract and is to be construed as other contracts. *Grayson v. Pure Oil Co.*, 189 Okl. 550, 118 P.2d 644; *Insurance Service Co. v. Finegan*, 196 Okl. 441, 165 P.2d 620. The intention of the parties is to be ascertained from the writing alone, if possible. 15 O.S.1941 § 155.

*Greeson v. Greeson,* 257 P.2d at 278–279.

¶12 Father points to the lack of specificity in an amount to be determined in the future. A lack of specificity in either the amount or scope of an obligation does not necessarily mean an absence of a judicially enforceable obligation. We have explained that even if a provision of a contract is too vague and indefinite to determine the intent of the parties, their conduct may supply the necessary information to determine intent of the parties. *Bartlett v. Sterling Const. Co.*, 1972 OK 67, 499 P.2d 425, 429.

¶13 The intent of the parties at the time they entered into an agreement controls the meaning of their written contract, and the statutory rules for ascertaining intent are set out at 15 O.S.2001 §§ 151 through 157. *Founders Bank and Trust Co. v. Upsher*, 1992 OK 35, 830 P.2d 1355, 1361.[1] The trial court made its decision in the context of a motion to dismiss challenging the jurisdiction of the trial court to award statutorily mandated support after a child has reached her majority. The trial court did not make findings of fact or law on the issue

---

1. 15 O.S.2001 § 151: "All contracts, whether public or private, are to be interpreted by the same rules, except as otherwise provided by law."

15 O.S.2001 § 152: "A contract must be so interpreted as to give effect to the mutual intention of the parties, as it existed at the time of contracting, so far as the same is ascertainable and lawful."

15 O.S.2001 § 153: "For the purpose of ascertaining the intention of the parties to a contract, if otherwise doubtful, the rules given in this chapter are to be applied."

15 O.S.2001 § 154: "The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity."

15 O.S.2001 § 155: "When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible, subject, however, to the other provisions of this article."

15 O.S.2001 § 156: "When through fraud, mistake, or accident a written contract fails to express the real intention of the parties, such intention is to be regarded, and the erroneous part of the writing disregarded."

15 O.S.2001 § 157: "The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the others."

of the parties' intent, the essential elements of an agreement, or the contested portion of the divorce decree. Further, although Mother alleges that a judicially enforceable agreement exists, neither Father or Mother identify the relevant principles of contract law that *may* apply to the controversy in support of their respective positions. This Court will not exercise its appellate jurisdiction to make first instance determinations on disputed questions of fact or law. *Oklahoma Public Employees Association v. Oklahoma Dept. of Central Services*, 2002 OK 71, ¶ 21, 55 P.3d 1072, 1081; *Patel v. OMH Medical Center, Inc.*, 1999 OK 33, ¶ 42, 987 P.2d 1185, 1201. This cause must, therefore, be remanded to the trial court for further proceedings.

¶ 14 We note that while this matter was pending the Legislature added 43 O.S.2001

§ 112.1A, and it provides that a court may order for the support of a child of any age in the event of certain disabilities.[2] Because we reverse the judgment of the trial court and remand the matter to that court we need not request briefs from the parties or address the applicability of new § 112.1A, if any, to this controversy.

¶ 15 The trial court dismissed the claims with two conclusions: first, that it did not possess subject matter jurisdiction, and secondly, that once a child reaches his or her majority the child is the proper party to bring a legal action against a parent for the parent's failure to pay support during that child's minority. A child does possess an independent right to maintain an action and to request support and maintenance. *State*

---

2. 43 O.S.2001 § 112.1A (eff. July 1, 2001).

§ 112.1A. Definitions—Child support—Parental rights and duties—Actions and jurisdiction

A. In this section:

1. "Adult child" means a child eighteen (18) years of age or older.

2. "Child" means a son or daughter of any age.

B. 1. The court may order either or both parents to provide for the support of a child for an indefinite period and may determine the rights and duties of the parents if the court finds that:

a. the child, whether institutionalized or not, requires substantial care and personal supervision because of a mental or physical disability and will not be capable of self-support, and

b. the disability exists, or the cause of the disability is known to exist, on or before the eighteenth birthday of the child.

2. A court that orders support under this section shall designate a parent of the child or another person having physical custody or guardianship of the child under a court order to receive the support for the child. The court may designate a child who is eighteen (18) years of age or older to receive the support directly.

C. 1. A suit provided by this section may be filed only by:

a. a parent of the child or another person having physical custody or guardianship of the child under a court order, or

b. the child if the child:

(1) is eighteen (18) years of age or older,

(2) does not have a mental disability, and

(3) is determined by the court to be capable of managing the child's financial affairs.

2. The parent, the child, if the child is eighteen (18) years of age or older, or other person may not transfer or assign the cause of action to any person, including a governmental or private entity or agency, except for an assignment made to the Title IV–D agency.

D. 1. A suit under this section may be filed:

a. regardless of the age of the child, and

b. as an independent cause of action or joined with any other claim or remedy provided by this title.

2. If no court has continuing, exclusive jurisdiction of the child, an action under this section may be filed as an original suit.

3. If there is a court of continuing, exclusive jurisdiction, an action under this section may be filed as a suit for modification pursuant to Section 115 of this title.

E. In determining the amount of support to be paid after a child's eighteenth birthday, the specific terms and conditions of that support, and the rights and duties of both parents with respect to the support of the child, the court shall determine and give special consideration to:

1. Any existing or future needs of the adult child directly related to the adult child's mental or physical disability and the substantial care and personal supervision directly required by or related to that disability;

2. Whether the parent pays for or will pay for the care or supervision of the adult child or provides or will provide substantial care or personal supervision of the adult child;

3. The financial resources available to both parents for the support, care, and supervision of the adult child; and

4. Any other financial resources or other resources or programs available for the support, care, and supervision of the adult child.

F. An order provided by this section may contain provisions governing the rights and duties of both parents with respect to the support of the child and may be modified or enforced in the same manner as any other order provided by this title.

*Dept. of Human Services ex rel. K.A.G. v. T.D.G.,* 1993 OK 126, 861 P.2d 990, 993. Whether the disputed portion of the decree is in fact an agreement allowing Mother to act on the child's behalf, and the effect of such an agreement upon Father's right to challenge Mother's representative status, if any, was not addressed by the trial court. The trial court's order must be reversed on this point as well.

¶ 16 Generally, we use a *de novo* standard to review a trial court's dismissal of a party's petition for relief because such dismissal is usually based solely upon an issue of law and not fact. *Miller v. Miller,* 1998 OK 24, ¶ 15, 956 P.2d 887, 894. Father's motion to dismiss argued that no consent decree existed, and that the parties could not, as a matter of law, agree to subject matter jurisdiction. The trial court order determines that no subject matter jurisdiction existed.

¶ 17 That order is correct insofar as it determines a lack of jurisdiction to award statutory child support under Title 43. But district courts have jurisdiction to adjudicate the existence and effect of contracts. Here the Mother's claim is for enforcement of a contract she alleges to be in effect. She alleges consideration for the bargain by way of her agreeing to give up part of her statutorily calculated child support. The Father does not dispute this, but the trial court has never adjudicated the existence or non-existence of that alleged contract. The trial court did not determine whether Father agreed to pay child support after the child reached her majority. We will not determine in the first instance whether the decree contains such an agreement. *Oklahoma Public Employees Association v. Oklahoma Dept. of Central Services, supra; Patel v. OMH Medical Center, Inc., supra.* The Mother is entitled to her day in court to prove what, if anything, the parties agreed to, and whether the Father is in fact in breach of any agreement.

¶ 18 The opinion of the Court of Civil Appeals is vacated. The judgment of the District Court is reversed, and the matter is remanded to the District Court for further proceedings consistent with this opinion.

¶ 19 WATT, C.J., OPALA, V.C.J., HODGES, HARGRAVE, KAUGER, SUMMERS, JJ., concur.

¶ 20 LAVENDER, BOUDREAU, WINCHESTER, JJ., dissent.

OPALA, V.C.J., concurring.

¶ 1 The court holds that in this post-decree proceeding the district court has cognizance to determine the quantum of Father's obligation (*if any he have*) to support his disabled adult child of a dissolved marriage. The dissent challenges for want of jurisdictional support the enforceability of Father's decree-imposed duty. Father's successful liability-defeating defense below calls on us here to *retest* the trial court's view that it lacked cognizance to enforce the decree-created obligation.[1] I write separately to answer Father's jurisdiction-anchored argument for the correctness of the nisi prius dismissal and to respond to the dissent's analysis of Father's defense theory.

¶ 2 Even if it were true that the decree portion sought to be enforced is patently infirm, at least insofar as it imposes on Father a duty to support his disabled adult child, *the district court would not be without jurisdiction to entertain Mother's quest for enforcement of that promise* and for *determination of the support's quantum.* The district court is an omnicompetent tribunal of "unlimited jurisdiction."[2] The constitutional breadth of its jurisdiction invests that court in this case with subject-matter cognizance over the claimed support for the parties' adult child. While the decree-imposed duty in contest may, for other reasons, be attacked as unenforceable, ***Father's jurisdiction-anchored defense does not defeat the***

---

**1.** As I understand Father's argument on certiorari, he makes (1) a broad challenge to the district court's *cognizance over the modification proceeding* because it was *"without jurisdiction"* either (2) *to impose* the very obligation that was sought to be enforced in this proceeding or (3) *to enforce* the decree-imposed obligation for want of specificity in the interspousal agreement.

**2.** Art. 7 § 7(a), Okl. Const. (*infra* note 5).

*trial court's cognizance over the subject matter of Mother's motion that will once again stand before it on remand.* The dissent's analysis, if adopted, would undermine the stability of judgments and unsettle their present-day invulnerability to delayed and procedurally impermissible attacks for mere mistakes of law. Father's challenge, based on want of specificity in the decree-approved support promise, cannot be catapulted to the level of a jurisdiction-vitiating defect. *Simply put, this case is not at all about jurisdiction but about post-remand enforceability of Father's decree-imposed duty.*

## I

## THE CRITICAL FACTS IN LITIGATION

¶3 Cynthia Jo (Mother or obligee) and Randall Dexter Holleyman (Father or obligor) were divorced by a 1993 consent decree. By its terms they agreed (a) to leave undetermined the quantum of Father's *post-majority support obligation* until the minor should reach the age of eighteen or complete high school and (b) to let the district court (upon either party's request) set the amount of Father's post-majority support obligation, based upon the then-established needs and requirements of the child-beneficiary. The divorced father stopped paying support when his child graduated from high school at the age of 21. By her post-decree proceeding now on review Mother moved to enforce Father's on-the-record, decree-approved promise to provide support for the parties' disabled offspring. After the trial court's *dismissal (for want of jurisdiction)* of Moth-

er's proceeding stood affirmed by the Court of Civil Appeals, we granted certiorari on Mother's petition.

¶4 The cognizance-related issues tendered by arguments on certiorari[3] call for a two-part analysis. In its *first* step we must ascertain whether the district court—in the exercise of its adjudicative authority over the parties' divorce—*had the power to approve an issue-expanding interspousal agreement.* If so, our *second* step should determine whether the approved agreement may be *enforced in this post-decree modification proceeding Mother filed in her divorce case.* For the reasons to be explained, I, like the court, resolve both issues by an affirmative answer.

## II

## THE DISTRICT COURT'S SUBJECT–MATTER JURISDICTION

### A.

*The District Court Has A Constitutionally–Derived Unlimited Original Cognizance Over Mother's Claim To Father's Support For Her Disabled Adult Child*

¶5 The district court's subject-matter jurisdiction is *derived* from the State's constitution. Under its provisions, the court serves as an omnicompetent, single-level, first-instance tribunal[4] with "unlimited original jurisdiction of all justiciable matters...."[5] While that constitutionally-con-

---

**3.** The certiorari arguments patently intermix the concepts of continuing with subject-matter jurisdiction. Mother argues that by the terms of the consent decree the trial court acquired "continuing jurisdiction" of the claim for enforcement of an on-the-record promise. Father, on the other hand, claims *the trial court is utterly without subject-matter jurisdiction to compel support payments after the child has reached the age of 21 and its want of jurisdiction cannot be cured* (or filled) by the parties' decree-merged agreement.

**4.** *See Eskridge v. Ladd,* 1991 OK 3, 811 P.2d 587 (Opala, C.J., concurring); *Matter of B.C.,* 1988 OK 4, ¶3, 749 P.2d 542, 548 (Opala, J., concurring in part and dissenting in part); *Lee v. Hester,* 1982 OK 30, ¶6, 642 P.2d 243, 246; *Childers v. Independent School Dist. No. 1 of Bryan County,*

1981 OK 123, ¶16, 645 P.2d 992, 999 (Opala, J., dissenting); *Interstate Brands Corp. v. Stephens,* 1980 OK 121, ¶2, 615 P.2d 297, 299 (Opala, J., concurring); *Logan v. Smith,* 1979 OK 148, ¶4, 602 P.2d 647, 651 (Opala, J., dissenting); *Carter v. Gullett,* 1979 OK 146, ¶3, 602 P.2d 640, 642 (Opala, J., dissenting).

**5.** The pertinent terms of Art. 7 § 7(a), Okl. Const., are:

"* * * The District Court shall have *unlimited original jurisdiction* of all justiciable matters, except as otherwise provided in this Article, and such powers of review of administrative action as may be provided by statute. * * *" (emphasis added).

Pre–1969 district courts were tribunals of *general jurisdiction.* Art. 7 § 7, Okl. Const. (repealed in

ferred jurisdiction is conceptually indivisible, even though its exercise stands carved into several separate dockets,[6] the *full sweep* of its cognizance cannot be abridged by either legislation or caselaw. *It is the constitutional breadth of the district court's jurisdiction, not the parties' consent, that operates to invest the trial court with cognizance over Mother's claim for an adult child's support. The district court clearly erred in bottoming its dismissal on "lack of jurisdiction."*

## B.

### *The Impact of Docket Boundaries on Divorce–Related Issues*

¶ 6 Interdocket boundaries *cannot be invoked to restrict the tribunal's constitutional omnicompetence.*[7] They are merely procedural demarcation lines separating different remedial regimes (small claims, probate, jury or non-jury cases) or dividing discrete classes of litigation (domestic, civil, criminal or the like). Because *interdocket boundaries are merely remedial (rather than jurisdictional )*, the district court's exercise of cognizance over any issue tendered for its judicature upon the wrong docket will not defeat its constitutionally-invested unlimited subject-matter jurisdiction. Neither may the docket boundary's extension render a judgment (or any of its parts) facially void as *coram non judice.*[8] Errors in crossing remedial inter-docket lines, though perhaps correctible on direct appeal,[9] will not impress themselves as a fatal flaw upon the face of the judgment roll.[10] *No remedial lines were crossed in this case.*[11]

¶ 7 Oklahoma's jurisprudential development has led to *a very early post-statehood accommodation of expanded issues cognizable within the cases placed upon what is now the family-and-domestic docket of the dis-*

1967, *eff.* Jan. 13, 1969); *Flick v. Crouch*, 1967 OK 131, ¶ 16, 434 P.2d 256, 261. Since 1969 district courts exercise unlimited original jurisdiction of all justiciable matters, except as otherwise provided by the Constitution. Art. 7 § 7, Okl. Const. (*eff.* Jan. 13, 1969); *State ex rel. Southwestern Bell Tel. Co. v. Brown*, 1974 OK 19, ¶ 21, 519 P.2d 491, 495.

6. The division of the district court's business into separate dockets is authorized by the provisions of 20 O.S.2001 § 91.2, which stand vitalized by this court's administrative directives (SCAD No. 99–87 (16 December 1999), 92–06 (24 December 1992), 89–7 (12 September 1989), 89–1 (31 January 1989), 68–1 (23 December 1968)). *See, e.g., Wilson v. Kane*, 1993 OK 65, ¶¶ 6–8, 852 P.2d 717, 721–22, for an analysis of interdocket remedial boundaries' impact on probate judicature.

7. Interdocket boundaries are not rigidly frozen along some jurisdictional lines. The notion of multiple procedural tracks for some classes of district court proceedings which cannot be accommodated by the Pleading Code is not new to the body of our adjective law. *See, e.g.,* the Uniform Adoption Act, 10 O.S.2001 § 7501–1.1 *et seq.;* the Oklahoma Children's Code, 10 O.S. 1991 § 7001–1.1 *et seq.;* statutes governing filiation proceedings, 10 O.S.2001 § 70 *et seq.;* condemnation proceedings for highways, 69 O.S. 2001 § 1708; condemnation proceedings for railroads, 66 O.S.2001 § 51 *et seq.;* probate procedure, 58 O.S.2001 § 1 *et seq.;* the provisions of 52 O.S.2001 §§ 318.2–318.8, commonly known as the "Surface Damages Act;" *Ward Petroleum Corp. v. Stewart*, 2003 OK 11, ¶ 11, 64 P.3d 1113, 1116; *City of Tahlequah v. Lake Region Elec.,*

2002 OK 2, ¶ 4, 47 P.3d 467, 473–74 (Opala, J., dissenting); *Wilson v. Kane, supra* note 6 at ¶¶ 6–8, at 721–22; *Williams v. Mulvihill*, 1993 OK 5, ¶ 8 n. 14, 846 P.2d 1097, 1102 n. 14; *Board of Law Library Trustees of Oklahoma County v. State ex rel. Petuskey*, 1991 OK 122, ¶ 5 n. 11, 825 P.2d 1285, 1288 n. 11.

8. A case is said to be *coram non judice* when the court in which it is brought *is without jurisdiction to settle the dispute. Goldman v. Goldman*, 1994 OK 111, ¶ 2, 883 P.2d 164, 166 n. 1, citing *Board of Law Library Trustees, supra* note 7, at ¶ 15 n. 31, at 1291 n. 31; Black's Law Dictionary at 305 (5th ed.1979).

9. *Wilson, supra* note 6, at ¶¶ 6–8, at 721–22.

10. A district court judgment (or order) is facially void if, on an inspection of the judgment roll, it is apparent that one or more of the requisite jurisdictional elements—that of subject matter jurisdiction, *in personam* cognizance, or the power to render a particular decision—is shown to have been absent. *Halliburton Oil Producing Co. v. Grothaus*, 1998 OK 110, ¶ 10, 981 P.2d 1244, 1249; *Scoufos v. Fuller*, 1954 OK 363, ¶ 15, 280 P.2d 720, 723. The materials included in the judgment roll are those enumerated in the provisions of 12 O.S.2001 § 32.1.

11. A suit for divorce, like condemnation, probate, adoption or juvenile cases, is not *stricto sensu* governed by the general regime of the Pleading Code. *Langley v. District Court of Sequoyah County*, 1993 OK 3, ¶¶ 2–3, 846 P.2d 376, 377; see in this connection *City of Tahlequah,*

*trict court.*[12] That docket has become the main channel for processing both divorce-and-family-status litigation as well as for all kinds of divorce-generated post-decree disputes. The district court's divorce-related authority includes approval of consent decrees [13] that confer upon the parties greater post-marital rights than those defined by statute.[14] *There is hence no need to direct here that after remand the cause be re-processed along a different docket route.*[15]

¶ 8 In sum, there is no longer any doubt about the propriety of allowing the parties in a divorce suit to expand the litigation's scope by injecting into the decisional process extra-statutory issues generated by an interspousal agreement that settles either some or all marital rights in contest. In this stage of our jurisprudential development, it is much too late to restrict the family-and-domestic docket disputes solely to rights that are stat-

*supra* note 7, at ¶ 4, at 473–74 (Opala, J., dissenting).

12. *Before the 1969 court reorganization, when the district court's constitutional jurisdiction was merely "general," this court had to confirm in a case-by-case approach whether matters not stricto sensu divorce-related (i.e., family-status or divorce-generated post-decree litigation) could be docketed in the district or in the county court.* If a case did not fit into the district court's then-maintained civil or divorce docket, it would be deemed a county court matter. *See, e.g., Green v. Green,* 1957 OK 70, 309 P.2d 276 (an action filed under the Uniform Reciprocal Enforcement of Support Act to secure support for a child of a bigamous marriage, in which the court held that it was properly brought before the district court); *Ex parte Yahola,* 1937 OK 306, 71 P.2d 968, 972, 180 Okl. 637 (the court allowed the district court's docket to accommodate an original habeas corpus proceeding by a child's father against its grandmother); *Ross v. Ross,* 1949 OK 35, 203 P.2d 702, 705 (an original suit for a minor child's support was allowed to be brought in the district court); the *Whitney v. Whitney* trilogy: (a) 1942 OK 268, ¶¶ 25–26, 134 P.2d 357, 361, 192 Okl. 174 (the court recognized an equitable property right, described as an interest in a quasi-partnership estate, arising from a bigamous marriage and held that this right, though not marital, could be settled in a district court lawsuit between bigamous spouses); (b) 1944 OK 205, 151 P.2d 583, 194 Okl. 361 (the court allowed former bigamous spouses to bring a district court action for settlement of property rights arising from their void marriage); (c) 1947 OK 44, ¶ 10, 181 P.2d 245, 246–47, 198 Okl. 681 (the court held that a contract for settlement of rights claimed by bigamous spouses was enforceable in the district court). *By the post 1969 district court's transformation from a general to an unlimited jurisdiction tribunal the fitness of a case for processing on the divorce track no longer presents a jurisdictional matter. All cases are now docketable (under one rubric or another) in the same single-level trial court.*

13. Oklahoma is in the mainstream of jurisdictions that allow interspousal agreements to expand litigation issues by inclusion of those the court could not entertain in their absence. See

the American Law Institute's (the authors and publishers of Restatements) Principles of the Law of Family Dissolution: Analysis and Recommendations [Principles] (adopted 16 May 2000), where it is observed that "[m]ost jurisdictions allow the court to incorporate agreement terms that the court does not have the power to order itself, and to enforce them as terms of the decree." *Id.,* § 7.10 (*Incorporation of the Terms of a Separation Agreement in a Decree*) Comment at 1022 (emphasis added); (Reporter's Notes at § 7.11, pg. 1023). According to the *Principles* (*Introduction* at pgs. 39–40), "[s]eparation agreements resolving the terms of dissolution are favored, both under existing law and these Principles." It counsels that "the law should enforce separation agreements unless the rules of contract, viewed in the context of family dissolution, have been violated, or the terms of the agreement would frustrate some important policy of the law of family dissolution." *Id.*

14. Oklahoma jurisprudence *has long sanctioned the expansion of the family-and-domestic docket cases by injecting issues* generated through consent decrees that go far beyond the legislative limit of divorce-related parameters. Consent decrees are a legitimate means of expanding rights of divorcing parties. *Whitehead v. Whitehead,* 1999 OK 91, ¶ 10, 995 P.2d 1098, 1101; *Dickason v. Dickason,* 1980 OK 24, ¶¶ 9 13, 607 P.2d 674, 677–78; *Greeson v. Greeson,* 1953 OK 111, ¶ 10, 257 P.2d 276, 278 (the parties consented to a post-decree retroactive modification of child support). Divorce-related orders, which expand the issues, were never treated as facially void even when the district court exercised only "*general jurisdiction.*" After the court came to be reorganized in 1969 and acquired **unlimited jurisdiction,** it is with even greater reason that we should now consider all consent-expanded issues effectively and legitimately within the district court's authority to settle.

15. Family-and-domestic docket boundaries are to be treated as elastic and dynamic with a shape that is far from static or mummified. They change as the law expands. Today's pronouncement adds no more than another logical sequence: an approved divorce-related promise to support one's disabled adult child, which is

utorily defined.[16] The district court's constitutionally-derived unlimited original jurisdiction of all justiciable matters cannot be shrunk by imprisoning its range of cognizance over divorce-related issues within the parameters circumscribed by the pre–1857 English-law antecedents.[17]

## III

### THE EXTENT OF THE DISTRICT COURT'S SUBJECT–MATTER JURISDICTION IN POST–DECREE STAGES

¶ 9 The district court's authority to approve an on-the-record agreement clearly includes the *power to enforce* the parties' pacts through post-decree modification proceedings

brought upon the family-and-domestic docket (under the earlier-assigned cause number).

¶ 10 Once an interspousal agreement is approved and incorporated into the decree, the parties' private contract stands converted to a solemn judicially enforceable obligation of record which is no longer one of a purely private-law (or contractual) character.[18] Because a mid-divorce, on-the-record promise to provide support for one's disabled adult child may be enforced in post-decree proceedings, the claim falls within the family-and-domestic docket boundary.[19] In that sense and for that purpose this district court docket may be said to *include all promise-generated, post-decree issues* to the end that *the same enforcement remedies stand accorded all decree-bottomed obligations—*

merged in the decree, is enforceable as a judgment, much like other consent-based obligations.

16. According to the dissent, "[w]hile a court may have general jurisdiction of the subject matter of a class of actions, it does not necessarily follow that the court may hear and determine a particular case submitted for its consideration. A court must have the judicial power to decide a particular matter and to render a particular judgment in order to pronounce a valid judgment.... The parties may not confer upon the court the jurisdiction to pronounce a particular decision it enters. 'Divorce was not recognized at common law, where divorces were either ecclesiastically or legislatively granted. The right to divorce is recognized as purely a creature of statute.' *Chapman v. Parr,* 1974 OK 46, ¶ 32, 521 P.2d 799, 803. Accordingly, all rights of parties with respect to divorce are fixed by the statutory law of the state." (citations omitted).

The dissent appears to view divorce litigation as firmly compressed in a straitjacket of statutory law. According to the dissent, despite its unlimited original jurisdiction, the district court is impotent to consider any divorce-related issue not specifically sanctioned by legislation. Overlooked by the dissent's analysis is that there•are no textually demonstrable indicia of legislative intent to curb the district court's capacity for broad judicature upon all issues directly related or ancillary to divorce contests. This State's (as well as the Nation's) jurisprudence strongly militates against adopting the dissent-suggested constraints upon divorce judicature, even if these constraints could pass constitutional muster. See Part III and IV of my concurrence.

17. Neither the three courts of common law nor that of chancery could dissolve a marriage (or grant a separate maintenance decree). A divorce *a mensa et thoro* (from "bed and board", which meant a decree of legal separation) could be procured from ecclesiastical courts; a divorce *a*

*vinculo matrimonii* ("from the bond of matrimony" or one granting "an absolute divorce," which means a marriage dissolution) might be obtained only by a special act of the British Parliament. Divorce jurisdiction was transferred in 1857 from ecclesiastical courts to the civil court system by the Matrimonial Causes Act of 1857, 20 & 21 Vict. c. 85. *See Reaves v. Reaves,* 1905 OK 32, ¶ 14, 82 P. 490, 494, 15 Okl. 240; *Irwin v. Irwin,* 1894 OK 29, ¶ 10, 37 P. 548, 557 (Scott, J., dissenting); 15 W. Holdsworth, A HISTORY OF ENGLISH LAW 205–06 (1965); Homer H. Clark, Jr., THE LAW OF DOMESTIC RELATIONS IN THE UNITED STATES § 16.1, at 619 (2d ed.1988); Max Radin, ANGLO AMERICAN LEGAL HISTORY § 269, at 512–513 (1936).

18. When an approved interspousal agreement is incorporated into the decree, the former (contract) is extinguished and merged in the latter (decree) by force of law. *Chapman v. Chapman,* 1984 OK 89, ¶ 11, 692 P.2d 1369, 1374; *Dickason, supra* note 14, at ¶ 9, at 677; *Acker v. Acker,* 1979 OK 67, ¶ 7, 594 P.2d 1216, 1219. While the district court is not bound by an agreement of the parties settling their property rights, alimony and child support (*Blount v. Blount,* 1967 OK 74, ¶ 18, 425 P.2d 474, 477), once the interspousal agreement is incorporated into the decree upon its judicial approval, the rights the parties enjoy under its terms will merge in the decree. *Chapman, supra,* at ¶ 11, at 1374. These rights cease to be contractual and become enforceable as a judicial obligation. *Dickason, supra* note 14, at ¶ 9, at 677; *Acker, supra,* at ¶ 7, at 1219.

19. *Warren v. Hunter,* 1981 OK 98, ¶¶ 3–4, 632 P.2d 418, 419 (an interparental support claim for an adult child is actionable by a parent who is providing the child with the necessities of life on a day-to-day basis; an equitable right of contri-

*those that are solely statute-based as well as those that derive from approved interspousal pacts.[20]*

¶ 11 We need not be concerned here about the custodial Mother's post-decree standing as a Hohfeldian [21] plaintiff to enforce Father's on-the-record promise. She is the obligee of a court-approved agreement as well as a co-contributor of support for her adult child. In that dual capacity she would be entitled to standing both as the beneficiary of an enforceable promise (if it proves to qualify under that category) as well as the actual provider of support for which legal liability will now extend to both parents.[22]

## IV

### THE DISSENT'S VIEW OF THE DECREE–IMPOSED SUPPORT DUTY AS A JURISDICTION–VITIATING FACIAL DEFECT RESTS ON THE MISTAKEN NOTION THAT (1) THE INTERSPOUSAL CONTRACT WAS INDEFINITE, (2) IT WAS UNENFORCEABLE *QUA* CONTRACT AND (3) ITS DECREE–IMPOSED DUTY STANDS SUSPENDED IN A JURISDICTIONAL VACUUM

¶ 12 The dissent appears to argue that had the trial court not dismissed Mother's motion (for want of cognizance), the efforts to enforce Father's promise would have been in vain because the decree-rendering nisi prius court stood *sans* cognizance to transform the decreed obligation into an enforceable judgment for the latter's want of a requisite jurisdictional element—that of power to enter a support judgment in favor of an adult child.[23] The decree's facial invalidity also is urged to stem from the dissent's view that the terms of the interspousal agreement are indefinite and hence unenforceable as a contract.

### A.

### *In the Absence of a Complete Judgment Roll, a Forensic Assessment of the Decree's Facial Invalidity Is Impermissible*

¶ 13 A judgment may not be attacked for facial invalidity when *the entire (complete) judgment roll* [24] has not been incorporated into the record for review.[25] The record before us falls far short of what is necessary to establish a facial jurisdictional defect in the 1993 duty-creating decree.[26]

### B.

### *A Mistake of Law Cannot Be Catapulted to the Level of a Jurisdictional Flaw*

¶ 14 Even if a complete judgment roll were now before the court, an attack on the de-

**20.** *Dickason, supra* note 14, at ¶¶ 9–13, at 677–78.

**21.** A Hohfeldian plaintiff is one who seeks judicial determination as a party litigant that it has "a right, a privilege, an immunity or a power" vis-a-vis the opposite party. *Macy v. Board of County Com'rs,* 1999 OK 53, ¶ 12 n. 28, 986 P.2d 1130, 1137–38 n. 28; *Toxic Waste Impact Group, Inc. v. Leavitt,* 1994 OK 148, ¶ 1 n. 1, 890 P.2d 906, 914 n. 1 (Opala, J., concurring); *Fowler v. Bailey,* 1992 OK 160 n. 6, 844 P.2d 141, 150 n. 6 (Opala, C.J., concurring); Louis L. Jaffe, *The Citizen As Litigant In Public Actions: The non-Hohfeldian or Ideological Plaintiff,* 116 U.Pa. L.Rev. 1033 (1968).

**22.** *Warren, supra* note 19, at ¶¶ 3–4, at 419 (parents, as co-obligors for child support, are required to contribute, either equally or equitably, toward the discharge of a common obligation).

**23.** For the three requisite jurisdictional elements, see *supra* note 10.

**24.** The record proper or judgment roll consists of "the petition, the process, return, the pleadings subsequent thereto, reports, verdicts, orders, judgments, and all material acts and proceedings of the court." 12 O.S.2001 § 32.1; *Elliott v. Guthrie,* 1986 OK 59, ¶ 7, n. 8, 725 P.2d 861, 863, n. 8; *Mayhue v. Mayhue,* 1985 OK 68, ¶ 8, n. 17, 706 P.2d 890, 895, n. 17.

**25.** The absence of a jurisdictional element from a judgment roll must be rested on record support. *Chamberlin v. Chamberlin,* 1986 OK 30, ¶ 8, 720 P.2d 721, 725; *Salazar v. City of Oklahoma City,* 1999 OK 20, ¶ 11–12, 976 P.2d 1056, 1061–62.

**26.** The record on appeal includes only three items from the judgment roll of the 16 October 1993 decree—Mother's divorce *petition,* Father's *answer* and the October 16 *journal entry* granting a divorce.

cree-imposed duty to provide support for the disabled adult child, based on an alleged facial flaw, would be impermissible. The defect Father invokes does not constitute an infirmity that would serve to divest the court of jurisdiction over the post-decree modification quest. The relied-on *infirmity in the critical decree clause* (if any there was) would at most constitute *legal error*, rather than a jurisdiction-vitiating defect. *A facially apparent mistake of law will not taint the judgment roll by an imprint of facial invalidity.*[27] Excessive use of the term "jurisdiction"—as mere synonym for error or for some other deficiency—introduces confusion into the law and **undermines the district court's constitutional sweep of cognizance.** This court's duty is to protect the stability of judgments rather than expose them to procedurally impermissible and hence unwarranted delayed attacks.

¶ 15 *A district court has jurisdiction over unenforceable judgments to the same extent as it does over nonactionable claims.*[28] When authority to deal with a subject is present, the *manner* and *extent* of the power's exercise, though patently excessive, must stand undisturbed, absent a direct attack timely launched within three years.[29] The interspousal agreement, even if deficient for lack of specificity, would no longer be vulnerable to an attack unless it be mounted for its

facial invalidity.[30] **Upon the record before us, that kind of attack is here clearly unwarranted.**[31]

### C.

### *The Misplaced Reliance On Chapman v. Parr Places District Courts In A Pre-Statehood Jurisdictional Straitjacket*

¶ 16 The dissent's reliance on *Chapman v. Parr*[32] for the notion that courts exercising divorce cognizance are *"without jurisdiction"* when entertaining issues not authorized by statutory divorce law *is an unwarranted extension of both* Chapman *and* Irwin v. Irwin,[33] *the case on which* Chapman *is bottomed.* *Chapman* dealt with the inapplicability of general venue statutes to divorce litigation. It *refused to extend* to divorce suits the common law's intrastate *forum non conveniens* doctrine. To that extent *Chapman* is still effective law. Insofar as *Chapman* appears to treat trial judges (sitting in divorce cases) as eunuchs fitted into a statutory straitjacket, its holding should be relegated to antiquarian lore as an aberrational exposition of post-statehood law. *Chapman* relies on *Irwin*,[34] a pronouncement by the Supreme Court of the Territory of Oklahoma. Insofar as *Chapman* would deny the district

---

27. *Matter of Estate of Mouse,* 1993 OK 157, ¶ 10, 864 P.2d 1284, 1286, citing *Vanguard Underwriters Ins. Co. v. Amick,* 1973 OK 86, ¶ 11, 512 P.2d 807, 808; *State ex rel. Commissioners of Land Office v. Keller,* 1953 OK 371, ¶ 19, 264 P.2d 742, 746; *Fitzsimmons v. City of Oklahoma City,* 1942 OK 422, ¶ 6, 135 P.2d 340, 342, 192 Okl. 248.

28. *Woodrow v. Ewing,* 1953 OK 60, ¶ 6, 263 P.2d 167, 171. Regardless of the post-remand proceeding's outcome, there is absolutely no doubt about the trial court's jurisdictional power to entertain Mother's modification quest.

29. See *Pettis v. Johnston,* 1920 OK 224, ¶ 19, 190 P. 681, 688 and *Scoufos, supra* note 10, at ¶ 33, at 725, holding that a judgment *valid on its face may not be attacked after the passage of three years.* Father did not attack the 26 October 1993 decree as facially infirm for want of jurisdiction until 2000. At that time he was limited to an attack for facial invalidity. See 12 O.S.2001 § 1038.

30. Jurisdiction is not wanting but merely exceeded when judicial authority is exercised errone-

ously. *Mayhue, supra* note 24 at ¶ 5 n. 8, at 893 n. 8; *Woodrow, supra* note 28, at ¶ 6, at 171. For the difference between *absence* and *excess* of jurisdiction see *Oklahoma Tax Com'n v. City Vending,* 1992 OK 110, ¶¶ 7–8, 835 P.2d 97, 104–05 (Opala, C.J., concurring in judgment).

31. *See* discussion in Part IV(F), ¶ 19, *infra.*

32. 1974 OK 46, 521 P.2d 799.

33. *Supra* note 17. The dissent also relies on *Williams v. Williams,* 1975 OK 163, ¶ 9, 543 P.2d 1401, 1403. In *Roesler v. Roesler,* 1982 OK 21, ¶ 4, 641 P.2d 550, 550–51, the court observes that "[w]hile divorce is wholly a creature of statute [citing *Williams, supra*], actions for divorce and division of property are of purely equitable cognizance." The quoted Roesler explanation correctly identifies the notion that Oklahoma judges who hear divorce cases are not in the straitjacket imposed by the English legal system's ecclesiastical or parliamentary antecedents.

34. *Supra* note 17.

court its power to entertain for approval agreement-generated issues, it is pure *ipse dixit*—a statement utterly unsupported by the text of *Irwin* or by any post-statehood jurisprudence of this court. The territorial court's pronouncement stands not only *sans precedential effect*, it is also imprisoned in territorial divorce law that is contrary to this court's extant (post-statehood) jurisprudence [35] (as well as to the present-day statutory divorce-law regime).

### D.

*Settled Common–Law Contract Jurisprudence Militates Against Attributing Lack Of Enforceability To The Decree–Imposed Support Obligation For Want Of Definiteness In Father's Promise*

¶ 17 Even under pure contract law the lack of the assumed obligation's specificity would not preclude its enforceability if the trial court is able to determine, with a reasonable degree of certainty, what the parties had intended.[36] A contract will not fail for lack of specificity in its terms if it is clear that the parties contemplated the open terms to be resolved in a *specified manner* and in a

*specified time.*[37] The parties' promise here under review specifies that the post-majority child support will be determined *by the trial judge* based upon the established needs and requirements of the disabled adult child *when he reaches the age of 18 or graduates from high school.* The decree-approved interspousal agreement in controversy clearly *contemplates further proceedings* to ascertain the *quantum* of Father's post-majority support obligation. The parties' agreement and the decree-imposed support duty are hence free from both legal infirmity and facial invalidity.

### E.

*The Common Law Of Contracts Is Not Implicated Here Because Mother Is Enforcing A Solemn Judicial Obligation, Not A Contract*

¶ 18 Mother is enforcing here a solemn judicial obligation created by the *merger* of Father's promise *in,* and its *incorporation into,* the decree which now stands converted to judgment [38] by caselaw that authorizes enforcement of approved interspousal agree-

**35.** *See, e.g., Whitehead, supra* note 14, at ¶ 10, at 1101 *Dickason, supra* note 14, at ¶¶ 9–13, at 677–78; *Greeson, supra* note 14, at ¶ 10, at 278.

**36.** *Brown v. Bivings,* 1954 OK 301, ¶ 13, 277 P.2d 671, 673; *Watts v. Elmore,* 1946 OK 232, ¶ 8, 176 P.2d 220, 223; *Webb v. Moran,* 1939 OK 369, ¶ 21, 96 P.2d 308, 312; *Harlow Publishing Co. v. Patrick,* 1937 OK 579, ¶ 0, 181 Okla. 83, 72 P.2d 511 syl. 2, 72 P.2d 511, 181 Okl. 83. Once it is determined that the parties intended to form a binding agreement, the certainty of the terms is important only as a "basis for determining the existence of a breach and for giving an appropriate remedy." Restatement (Second) of Contracts § 33(2).

**37.** It is a settled principle that the law does not favor invalidation of agreements on the ground of uncertainty. A contract is not void for uncertainty because it fails to set out details as to the subject matter if it can be ascertained with a reasonable degree of certainty what the parties intended. *Brown, supra* note 36, at 673; *Watts, supra* note 36, at 223; *Webb, supra* note 36, at 312. *This has long been the common law in Oklahoma. It is now codified in 12A O.S.2001 § 2–204 of the Uniform Commercial Code [UCC].* The terms of 12A O.S.2001 § 2–204(3) provide in pertinent part: "Even though one or

more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy." According to the Uniform Commercial Code Comment that follows § 2–204, "Oklahoma courts have not previously required absolute certainty in all respects to grant relief. The agreement has been held sufficiently certain if the court could determine the intention of the parties. * * * Since the Oklahoma courts have previously been liberal in considering all the circumstances, and searching for the intention of the parties in enforcing an agreement, it does not appear that this section materially changes Oklahoma law." In sum, the common law that antedates the adoption of Article 2 of the UCC, much like the Article itself, supports the enforceability of contracts with terms that are indefinite but capable of being ascertained by methods agreed upon and known to both parties. The lack of specific terms does not necessarily invalidate contracts as long as the open or missing terms could be reduced to certainty by the use of extraneous evidence. 1 CORBIN ON CONTRACTS, § 4.1, p. 533 n. 19 (1993).

**38.** *Chapman, supra* note 18 at ¶ 11, at 1374; *Dickason, supra* note 14, at ¶ 9, at 677; *Acker, supra* note 18, at ¶ 7, at 1219.

ments *qua* judgment.[39] Because Father's promise to provide support for his disabled adult child (1) is not unenforceable as a contract lacking specificity[40] and (2) is a vital part of the agreement incorporated into and merged in the decree, now invulnerable to attack for nonfacial defects,[41] *the district court is vested with authority to adjudicate the modification quest in the exercise of its (Mother-invoked) power to ascertain and enforce the quantum of Father's assumed obligation.*

### F.

***According To The Mainstream Of American Jurisprudence On The Subject, A Promise To Support One's Disabled Adult Child Is Neither Contrary To Public Policy Nor Unenforceable***

¶ 19 Although the early common law did not extend one's *parental duty of support* beyond a child's minority,[42] the great majority of American jurisdictions, in which the statutory law is silent, has recognized an exception where, as here, the child is unable to care for itself upon attaining majority.[43] This view is rested on common-law developments.[44] While at the time of the 1993 decree the issue had neither been addressed by

this court nor by the legislature, the parents' interspousal agreement that creates a support duty clearly is not contrary to public policy nor to the mainstream of American jurisprudence.

¶ 20 An interspousal agreement that does not offend any public policy principles qualifies for judicial approval. The outer bounds of the district court's jurisdictional perimeter for decretal incorporation of approved agreements are co-extensive with their sanctioned terms. The critical terms in contest here are: (1) Father's promise-based assumption of post-majority support responsibility, (2) whose quantum is to be set after performance is due, (3) in a post-decree proceeding (4) which will be processed through and enforced by the trial court in the very same manner as if it were an imposed nonconsensual duty. None of these terms exceeds the district court's jurisdictional boundary. Their incorporation does not inject a fatal flaw into the judgment roll.[45] Moreover, no judgment may be condemned for facial invalidity without a *judicial inspection of the entire roll.*[46] The dissent's attempt to exempt consent decrees from the law's requirement (calling for a four-corners' examination

---

**39.** *See* cases cited in *supra* note 14.

**40.** *See* Part IV(D), *supra.*

**41.** *See* Part III, *supra.*

**42.** *Nelson v. Nelson,* 548 A.2d 109, 113 (D.C. 1988) (citing Annotation, *Parent's Obligation to Support Adult Child,* 1 A.L.R.2d 910 (1948)).

**43.** See American Law Institute's PRINCIPLES, *supra* note 13, Introduction at pgs. 39–40, §§ **3.13(1)** (*Effect of a Parental Agreement on a Child Support Award*), **3.24(4)** (*Duration of the Child Support Obligation*), **7.09** (*The Enforceability of a Separation Agreement*), **7.10** (*Incorporation of the Terms of a Separation Agreement in a Decree*). The pertinent terms of § 3.13(1) are: "The child-support terms of a parental agreement should be approved and adopted by the court unless the agreement provides for substantially less child support than would otherwise be awarded under this Chapter." The terms of § 3.24(4) state: "The parties may by agreement extend the duration of the child-support obligation." According to Comment h to § 3.24: "The parties may always agree to obligations to a child or to each other that exceed those imposed by law. This is a consistent theme in current law and in these

Principles." Comment g to § 3.24 notes that the *statutes of most states are silent as to post-majority support for disabled children,* "in which case many courts have judicially extended the support obligation to adult disabled children." *Id., citing in support Kamp v. Kamp,* 640 P.2d 48, 50–51 (Wyo.1982); *Streb v. Streb.,* 774 P.2d 798, 800 (Alaska 1989); *Koltay v. Koltay,* 667 P.2d 1374, 1377 (Colo.1983); *Nelson, supra* note 42, at 119; *Castle v. Castle,* 15 Ohio St.3d 279, 473 N.E.2d 803, 806–807 (1984); *Kinder v. Schlaegel,* 185 W.Va. 56, 404 S.E.2d 545 (1991), *but noting a contrary view in Smith v. Smith,* 433 Mich. 606, 447 N.W.2d 715 (1989).

**44.** In *Nelson, supra* note 42, the court observes that in the absence of statute (a) the "trend among courts considering this issue is to recognize the parental duty of support for the adult disabled child as a natural extension of the common law obligation of support for minor children" (*id.* at 116) and (b) that the vast majority of those courts "have found that the developing common law imposes such a duty" (*id.* at 115).

**45.** *See* Part IV(B) *supra.*

**46.** *See* Part IV(A) *supra.*

of the record proper) rests neither on logic nor on extant authority.[47] Mother's decree is clearly impervious to the dissent's attack on its facial fitness. Were we to follow today the dissent's analysis and were we to condemn—upon an incomplete judgment roll—the assailed part of the decree as unenforceable for facially apparent jurisdictional excess, Mother's adjudged rights would become impermissibly extinguished by interposition of after-pronounced jurisprudence. *Because the validity, meaning, and effect of a judgment must always be assayed by the law in force at the time it was entered, judicial testing of these factors in an adjudged obligation must be kept free from impairment by after-enacted legislation and by after-promulgated caselaw.*[48]

## V

## SUMMARY OF MY VIEWS IN CONCURRENCE

¶ 21 *Constitutional omnicompetence of the district court is not subject to legislative abridgement.* The district court's "unlimited jurisdiction" includes the authority to resolve extra-statutory status- or promise-related issues generated by a decree-approved, on-the-record interparental agreement for post-majority support of a disabled child of the marriage. The *issues settled by an interspousal agreement,* though expanding the divorce suit's range of cognizable matters, *neither defeat the court's subject-matter jurisdiction* nor make the suit unqualified for processing upon the family-and-

domestic docket as a post-decree dispute. The district court's authority extends to those issues, arising after the divorce decree, which were generated by an approved (and memorialized) mid-divorce agreement imposing on Father a duty to support his disabled adult child.

¶ 22 The parties in a divorce suit may expand the litigation's scope by injecting into the decisional process extra-statutory issues generated by their approved agreement which settles some or all marital rights in controversy. The district court's constitution-derived omnicompetent cognizance that unquestionably includes divorce suits may not be circumscribed by resort to pre 1857 English-law restrictions (once attached to ecclesiastical divorce judicature and to the now-defunct authority of the British Parliament to dissolve marriages by special acts).[49] Nonprecedential pre-statehood jurisprudence that would make the district court impotent to consider any divorce-related issues outside of those specifically sanctioned by legislation cannot be regarded as a correct exposition of present-day Oklahoma law.

¶ 23 Settled common-law contract jurisprudence firmly militates against declaring Father's assumed obligation unenforceable because his promise was not in a definite amount. The case presents no real challenge to the trial judge's *jurisdiction* over Mother's post-decree child-support quest. The decree-imposed obligation is now invulnerable to any attack *for want of jurisdiction* other than one pressed on grounds of facial

---

**47.** Consent decrees are not an exempted rubric from the *sine qua non* four-corners' examination. The parties failed to stipulate as to (or even suggest that they agreed on) the contents of the complete judgment roll *in the proceedings that led to the decree here under the jurisdictional scrutiny.* **The burden to show a flaw on the face of the judgment roll is cast on Father.** *Salazar, supra* note 25, at ¶ 11, at 1061. **It was his duty to have in the record the four corners of the judgment roll. The record for Mother's appeal is devoid of her stipulation that the decree is facially and fatally void. Nothing short of Mother's stipulated admission (or concession) will support the dissent's analysis.**

**48.** *Hedges v. Hedges,* 2002 OK 92, ¶ 26, 66 P.3d 364, 374; *Evans v. Evans,* 1993 OK 59, ¶¶ 10–11, 852 P.2d 145, 149; *Messenger v. Messenger,* 1992

OK 27, ¶ 12, 827 P.2d 865, 870; *Timmons v. Royal Globe Ins. Co.,* 1985 OK 76, ¶ 13, 713 P.2d 589, 594 n. 18; *Mayhue v. Mayhue,* 1985 OK 68, ¶ 6, 706 P.2d 890, 894; *Nantz v. Nantz,* 1988 OK 9, ¶ 6, 749 P.2d 1137, 1143 (Opala, J., dissenting); *Harry R. Carlile Trust v. Cotton Petroleum Corp.,* 1986 OK 16, ¶ 24, 732 P.2d 438, 449; *Wootten v. Askew,* 1983 OK 37, ¶ 8, 668 P.2d 1123, 1124–125, *citing Crain v. Farmer's United Cooperative Pool,* 1970 OK 134, ¶ 13, 472 P.2d 882, 884 and *Curtis v. Barby,* 1961 OK 252, ¶¶ 31–32, 366 P.2d 616, 622; *Bomford v. Socony Mobil Oil Co.,* 1968 OK 43, ¶ 24, 440 P.2d 713, 720–21; *American-First Title & Trust Company v. Ewing,* 1965 OK 98, ¶ 40, 403 P.2d 488, 496.

**49.** For the various English restrictions upon divorce judicature see *supra* note 17.

invalidity. The record for this certiorari review presents no facial appearance of any fatal jurisdictional flaw. Even an apparent *mistake of law* would not taint the judgment roll by an imprint of facial invalidity. *If ordinary error were to become a facial jurisdictional infirmity no judgment would be safe from delayed and unwarranted attack. Public policy calls on this court to stabilize judgments and protect them from unauthorized assaults.* The district court *is not divested of jurisdiction to entertain Mother's quest for enforcement of Father's decree-imposed duty.* District courts have jurisdiction of actions that are barred by limitations as well as of those in which enforceability of a decree is sought to be defeated on jurisdictional grounds.

¶ 24 This case is *not at all about want of jurisdiction* but rather about *enforceability of Father's decree-imposed duty* to support his disabled adult child. Even if, as Father urges, his decree-imposed duty were jurisdictionally flawed, the district court would have jurisdiction to accept or reject that defense. The trial court's dismissal "for want of jurisdiction" was clearly erroneous and must be reversed even if the nisi prius court, by its ruling's confusing phraseology, meant to *accept* Father's jurisdictional challenge. For the latter disposition there is here a total absence of record-supported facial invalidity.

¶ 25 I hence concur in reversing the nisi prius order and remanding the cause for post-remand proceedings to be consistent with today's pronouncement

BOUDREAU, J., with whom LAVENDER and WINCHESTER, JJ., join, dissenting:

¶ 1 I dissent because there is a major difference between enforcing an agreement between a husband and wife that obligates one or the other to pay child support after a child reaches majority, and enforcing an agreement which attempts to vest the court with jurisdiction to determine a child support obligation after the child reaches majority.

Enforcing the latter agreement impermissibly allows the parties to confer jurisdiction upon the court to pronounce a particular decision that the Legislature has not currently extended to the court.

¶ 2 In this case, the trial court correctly determined that the parties did not enter into a legally enforceable agreement as to the terms of their obligations after the child reaches majority. They merely agreed that the court would "retain jurisdiction" to decide a post-minority application for child support. Their agreement reads, in pertinent part:

> IT IS THEREFORE ORDERED, ADJUDGED AND DECREED by the Court that the Defendant shall pay child support in the amount of Four Hundred Dollars ($400.00), deviated from the child support guidelines, attached hereto as Exhibit "A", as agreed upon by the parties. Due to the special needs of the minor child, the parties have agreed to leave the child support open after the minor child reaches the age of eighteen (18) and/or completes high school, and the Court will *retain jurisdiction for either party to file an application for further support based upon the specific needs and requirements of the minor child, if any.*

(emphasis added).

¶ 3 While a court may have general jurisdiction of the subject matter of a class of actions, it does not necessarily follow that the court may hear and determine a particular case submitted for its consideration. A court must have the judicial power to decide a particular matter and to render a particular judgment in order to pronounce a valid judgment. *Stork v. Stork,* 1995 OK 61, 898 P.2d 732, 738 n. 17; *Petty v. Roberts,* 1939 OK 560, 98 P.2d 602; *Isenhower v. Isenhower,* 1983 OK CIV APP 12, 666 P.2d 238. The parties may not confer upon the court the jurisdiction to pronounce a particular decision it enters.[1]

---

1. The jurisdiction necessary to empower a court to render a valid judgment is of three types: (1) jurisdiction of the parties, (2) jurisdiction of the general subject matter and (3) judicial power to decide a particular matter and to render the particular judgment. If any one of these three requisites is lacking, the purported judgment is a nullity and is void. *Kittredge v. Kittredge,* 1995 OK 30, 911 P.2d 903.

¶ 4 "Divorce was not recognized at common law, where divorces were either ecclesiastically or legislatively granted. The right to divorce is recognized as purely a creature of statute." *Chapman v. Parr,* 1974 OK 46, 521 P.2d 799; *Williams v. Williams,* 1975 OK 163, 543 P.2d 1401, 1403. Accordingly, all rights of parties with respect to divorce are fixed by the statutory law of the state.

¶ 5 The relevant statute in this case provides:

> Any child shall be entitled to support by the parents until the child reaches eighteen (18) years of age. If a dependent child is regularly and continuously attending high school, said child shall be entitled to support by the parents through the age of eighteen (18) years.

43 O.S. Supp.1993 § 112(D) (eff. June 7, 1993).

¶ 6 In enacting this statute, the Legislature limited the authority of the trial court to issue a child support order. The authority of the trial court comes to an end when a child reaches eighteen years of age (or later, if the child is regularly and continuously attending high school) and the court has no power to make or continue a provision for child support thereafter. Certainly the Legislature can extend the trial court's authority if it so desires, *Lookout v. Lookout,* 1974 OK CIV APP 21, 526 P.2d 1405, but that power resides only with Legislature, not with the parties.

¶ 7 The concurring opinion goes to great lengths to stress that Oklahoma allows judicial approval of consent decrees that confer upon the parties greater post-marital rights than those defined by statute. This proposition of law cannot be seriously contested. Unquestionably the parties in a divorce action may, by agreement, expand the issues beyond what a trial court could. *Whitehead v. Whitehead,* 1999 OK 91, 995 P.2d 1098; *Kittredge v. Kittredge,* 1995 OK 30, 911 P.2d 903. Likewise, there is no doubt that a parent can bind himself or herself by agreement to support a child beyond minority. However, that agreement may be enforced by the court only if the parties intend the agreement to be final and binding and only if the agreement leaves nothing for determination by the court on the question of the terms of the obligation. *See Whitehead,* 995 P.2d at 1101.[2]

¶ 8 Before today, we had held that a trial court retains jurisdiction in a divorce action to enforce the parties' agreement that the wife would receive a certain percentage of the husband's future income in lieu of property division. *Kittredge, supra.* We had also held that a trial court retains jurisdiction to enforce the parties' agreement that the wife would receive "$650.00 per month ... for such period as [the husband] continues to draw employment or retirement income from Burlington Northern and Army retirement." *Whitehead, supra.* In both *Kittredge* and *Whitehead,* the parties entered into a final agreement that left nothing for determination by the court on the question of the terms of the agreement.

¶ 9 Today, the majority opinion seems to say there is no difference between what the parties agreed to in *Kittredge* and *Whitehead* and what the parties agreed to in this case. In my view there is a major difference. In the former cases, the parties entered into fully executed agreements which left the trial court with nothing to do but enforce the agreed terms. In this case, the parties left the terms of their post-minority child support obligations open for the court to decide after the child reached majority.

¶ 10 While a trial court may *approve and enforce* any type of issue-expanding agreement offered by the parties in a divorce case, the trial court may not *determine* issues beyond the scope of its statutory authority, even when the parties attempt to confer such power on the court.

---

**2.** In arguing that even under pure contract law the lack of the assumed obligation's specificity would not preclude its enforcement, the concurring opinion cites § 2–204(3) of the Oklahoma Uniform Commercial Code, 12A O.S.2001 §§ 1–101 *et seq.* Section 2–204(3) applies only to transactions in goods and has no applicability to this case. Rather, this case is governed by the common law of contracts which requires a contract to be sufficiently definite in its significant terms to be enforceable. *Edwards v. Board of Education of Oklahoma City,* 1946 OK 183, 169 P.2d 1015.

¶ 11 The concurring opinion argues that if there is an infirmity in the decree, it would at most constitute legal error rather than a jurisdictional-vitiating defect. I respectfully disagree. The critical clause in the decree, in my opinion, constitutes more than legal error or the erroneous exercise of judicial authority. It attempts to vest the court with a power that is not provided by statute. In this situation, jurisdiction is wanting.

¶ 12 The trial court's decision is void for lack of jurisdiction because the face of the judgment roll reveals that at least one of the three elements of jurisdiction is lacking, the judicial power to pronounce the particular decision that was entered. *Stork v. Stork*, 1995 OK 61, 898 P.2d 732, 738.[3] Accordingly, the decision may be attacked at any time in the same case or by an independent action. *Halliburton Oil Producing Co. v. Grothaus*, 1998 OK 110, 981 P.2d 1244, 1249.

¶ 13 In sum, a parent can bind himself or herself by agreement to support a child beyond minority, but the parents cannot confer jurisdiction on a court to *decide*, after the child has reached majority, the terms of post-minority child support. In the case in controversy, the trial court accurately apprehended that the parties did not enter into an agreement as to the terms of the their obligations after the child reaches majority, but merely agreed that the court could retain jurisdiction to decide their post-minority application for child support. The trial court correctly determined that it had no jurisdiction to decide the issue.

¶ 14 I would affirm the trial court.

## SUPPLEMENTAL OPINION AFTER REHEARING'S DENIAL

OPALA, V.C.J.

¶ 1 This matrimonial dispute comes now for our consideration of appellant's motion to tax costs. See Supreme Court Rule 1.14a[1] and the provisions of 12 O.S.2001 § 978.[2] Appellant's motion is granted and the three cost items sought to be recovered (totaling $333.75) stand allowed.

### I

**THE PROVISIONS OF § 978 COMMAND THAT A PREVAILING APPELLANT'S COSTS ON REVERSAL OF A JUDGMENT BE TAXED *DE CURSU*[3]**

¶ 2 The terms of § 978, whose process and return, the parties stipulate in their briefs that they entered into and signed a consent divorce decree. The judgment roll of the consent divorce decree (aided by the parties admissions in their briefs) is complete enough to warrant a pronouncement that the decree is facially void.

---

3. The concurring opinion argues that we lack a complete judgment roll on appeal and, accordingly, the 1993 decree cannot be attacked for facial invalidity. The judgment roll consists of "the petition, the process, return, the pleadings subsequent thereto, reports, verdicts, orders, judgments, and all material acts and proceedings of the court." 12 O.S.2001–32.1. While generally this Court will not notice any instrument that is not part of the appellate record, uncontroverted facts outside that record which stand admitted in the parties' briefs may be considered to supplement the deficiently-assembled or incomplete judgment roll. *First Federal Savings & Loan Assn. v. Nath*, 1992 OK 129, 839 P.2d 1336, 1342 note 32.

Neither party voiced an objection to the trial court's determination of the consent divorce decree's facial invalidity based upon an incomplete judgment roll, nor asserted that any missing documents, if presented there for inspection, would reveal anything legally significant relating to the condition of the decree's judgment roll. Nor was any objection ever raised before this Court on that ground. The record on appeal includes all essential items from the judgment roll of the 1993 decree: the mother's divorce petition, the father's answer, and the journal entry granting the decree. Although it does not contain the

1. The terms of Rule 1.14a, 12 O.S.2001, App. 1, in pertinent part, provide:

"The Clerk shall not tax as costs any expense unless the person claiming the same, prior to issuance of a mandate in the cause, shall file with the Clerk a verified statement of taxable cost items showing that person has paid the same."

2. The provisions of 12 O.S.2001 § 978 state:

"When a judgment or final order is reversed, the plaintiff in error *shall recover his costs*, including the costs of the transcript of the proceedings, or case-made, filed with the petition in error; and when reversed in part and affirmed in part, costs shall be equally divided between the parties." (emphasis supplied)

3. Simply rendered, *de cursu*—which translates as "of course"—means in the context of taxing costs

enforcement procedure is regulated by Rule 1.14a, **mandate** that at the conclusion of appellate litigation the prevailing party be entitled to recover taxable costs *de cursu.*[4] The court clerk may tax statutory court costs, such as those described as filing fees, to the losing party *sans* judicial intervention.[5] If the prevailing party has submitted a "verified statement of taxable cost items" *before* issuance of the mandate in accordance with Rule 1.14a, the victorious litigant may also be awarded the court reporter's expenses.[6]

■ ¶3 As prevailing party on reversal appellant is entitled to two filing fees (for her petition in error and that for certiorari), totaling $300.00. These cost items are deposits taxable *de cursu.* They should be granted to appellant (as prevailing party on reversal of the trial court's dismissal order) in accordance with the terms of § 978. Appellant also is entitled to have the court reporter's expense ($33.75) taxed as costs. Before the issuance of mandate, she has submitted, as required by Rule 1.14a, proof of payment for the court reporter's services.

## II

that after judgment or appellate decision, ordinary cost items are generally taxed summarily by the ministerial act of a clerk, without any antecedent judicial action or a party's request. *Chamberlin v. Chamberlin*, 1986 OK 30, ¶ 11 n. 25, 720 P.2d 721, 726 n. 25. **We regulate taxation of these *de cursu* cost items by procedure prescribed by Rule 1.14a.**

4. *See* the provisions of § 978, *supra* note 2; *Williams Natural Gas Company v. Perkins*, 1997 OK 72, ¶ 26, 952 P.2d 483, 491.

5. *Perkins, supra* note 4, ¶ 26, at 491; *Chamberlin, supra* note 3, ¶ 11 n. 25, at 726 n. 25.

6. *Chamberlin, supra* note 3, ¶ 11, at 726; *see* generally, *Owens v. Clark*, 1936 OK 558, 61 P.2d 201, 177 Okla. 519 (holding that a party who won reversal on appeal was entitled to costs on appeal sought in the manner provided by Supreme Court Rule No. 22 [present-day Rule 1.14]).

## THE TERMS OF § 978, WHICH APPLY TO ALL APPEALS, ARE NOT ALTERED BY THE MATRIMONIAL CHARACTER OF THE CASE

■ ¶4 The provisions of § 978 and of Rule 1.14a are as applicable to appeals in matrimonial disputes as they are to appeals in other classes of litigation.[7] Though *Gilcrease v. Gilcrease,*[8] a 1936 case, declares that the Supreme Court is vested with "absolute discretion" to tax costs on appeal of a divorce proceeding, its text is not a correct exposition of present-day law governing costs on appeal of a matrimonial dispute.[9] The language in *Gilcrease* which adopts this view is pure *ipse dixit.* The opinion cites no authority upon which the rule was rested.[10] Moreover, the view expressed there is an aberration upon the Oklahoma-law landscape. Its pronouncement—that taxing appellate costs in divorce cases is purely discretionary—has not been followed in any other Oklahoma published opinion. In short, the *Gilcrease* norm no longer carries the force of law. Because the case has never been cited in any Oklahoma opinion nor followed in actual day-to-day Supreme Court practice, it fell into disuse and lost its efficacy by the doctrine of *desuetude.*[11] ***It is hereby overruled.***

7. *Chamberlin, supra* note 3, ¶ 11, at 726 (applying § 978 to a party's request for appellate costs in a matrimonial dispute); *Jackson v. Jackson*, 2002 OK 25, ¶ 22, 45 P.3d 418, 429 (declining to grant a party in a divorce proceeding its costs on appeal because it was not the prevailing party on reversal of a judgment, a ruling consistent with the terms of § 978).

8. 1936 OK 50, 176 Okla. 237, 54 P.2d 1056, sylb. 3.

9. *Chamberlin, supra* note 3, ¶ 11, at 726; *Jackson, supra* note 7, ¶ 22, at 429.

10. *See Gilcrease, supra* note 8, at sylb. 3.

11. *See Poe v. Ullman*, 367 U.S. 497, 511–12, 81 S.Ct. 1752, 1760, 6 L.Ed.2d 989 (1961). "[A] legal norm may lose its validity by never being applied or obeyed—by so-called desuetude. Desuetude may be described as negative custom, and its essential function is to abolish the validity of an existing custom." Hans Kelsen, Pure Theory of Law, 213 (Max Knight Trans.1967).

## III

### THE PROVISIONS OF § 978 ARE NOT IN PARI MATERIA[12] WITH THOSE OF 43 O.S.2001 § 110D[13]

¶5 The terms of § 978 and those of § 110D do not regulate the same subject matter and should not be construed together. The provisions of § 978 address *solely* costs on appeal while those of § 110D *primarily* authorize allowance of expenses in trial-court litigation. A party who seeks to tax appellate costs under the authority of § 978 must initiate its pursuit in the appellate court,[14] while a litigant in quest of a § 110D matrimonial allowance must initially press for that relief in the trial court.[15] In short, *§ 110D allowances are generally not granted but only reviewed* by the appellate tribunal. Moreover, the terms of § 978 govern taxable appellate **"costs"** exclusively,[16] whereas those of § 110D regulate allowance of **"expenses"** incurred in enforcing or modifying a divorce-court order.[17] **Costs are not expenses.**[18] The former are creatures of statutes[19] and are taxed *de cursu* by the court clerk[20] based upon specific tariffs enacted by the legislature. Expenses, on the other hand, require judicial determination and may be subject to equitable apportionment.[21] Costs *de cursu*, as distinguished from expenses, are never regulated by equitable principles. They are purely statutory.[22] The terms "costs" and "expenses" are neither interchangeable nor synonymous. In appeals from matrimonial disputes, § 110D (which addresses only expenses) will not control over § 978 (which governs costs on appeal).

¶6 Though *Larman v. Larman*[23] and *Stepp v. Stepp*[24] left each party in a divorce proceeding with the burden of paying its own attorney's fee and litigation-related expenses, these cases are not germane to today's analysis. Neither *Larman* nor *Stepp* addresses taxable appellate costs (which are at issue here). *Bingham v. Bingham*[25] also is inapposite to the issue before us. Though *Bingham* divides the appellate costs equally between the parties in a matrimonial dispute, it does not state any grounds or cite any authority (not even § 110D) for this conclusion.[26] *Bingham* does not refer to taxation of appellate costs upon reversal of a judgment. It deals only with allocation of these costs upon affirmance of a judgment.[27] Finally, *Bingham* lacks precedential status.

---

12. Statutes *in pari materia* are those that relate to the same person or thing or having a common purpose. Black's Law Dictionary 711 (5th ed.)

13. The provisions of 43 O.S.2001 § 110D (now § 110E) state:

   "The court may in its discretion make additional orders relative to the expenses of any such subsequent actions, including but not limited to writs of habeas corpus, brought by the parties or their attorneys, for the enforcement or modification of any interlocutory or final orders in the divorce action made for the benefit of either party or their respective attorneys."

14. *See* the terms of § 978, *supra* note 2.

15. *See* the provisions of § 110D, *supra* note 13.

16. *See* the terms of § 978, *supra* note 2.

17. *See* the provisions of § 110D, *supra* note 13.

18. *See Fleet v. Sanguine, Ltd.*, 1993 OK 76, ¶20, 854 P.2d 892 (differentiating between ordinary court costs that may be taxed *de cursu* and equitable litigation expenses); for an explanation of equitable litigation expenses see generally, *Rand v. Nash*, 1935 OK 1086, 51 P.2d 296, 174 Okla.

525. The terminology used for granting costs and expenses differs widely. Statutory costs are "taxed" by the court while equitable expenses are "allowed" by a judge's ruling.

19. *Howe v. Fed. Surety Co.*, 1932 OK 730, ¶27, 17 P.2d 404, 407, 161 Okla. 144; see also *Owens*, *supra* note 6, ¶20, at 203.

20. *Chamberlin*, *supra* note 3, ¶11 n. 25, at 726 n. 25.

21. *Fleet*, *supra* note 18, ¶20, at 902; see also, *Rand*, *supra* note 18.

22. *See Howe*, *supra* note 19, ¶27, at 407, *Owens*, *supra* note 6, ¶20, at 203.

23. 1999 OK 83, 991 P.2d 536.

24. 1998 OK 18, 955 P.2d 722.

25. 1981 OK CIV APP 26, ¶19, 629 P.2d 1297, 1301.

26. *Id.*

27. *Id.*

## IV

## WHEN TAXING COURT COSTS COURTS MUST ADHERE STRICTLY TO LEGISLATIVE ENACTMENTS

■ ¶ 7 Combining an appeal-related attorney's fee with appellate costs for treatment as a single category of burdens to be imposed in the aftermath of appellate litigation strips the Legislature of its control over court costs. Early jurisprudence carefully avoids this conflict between legislative and judicial authority by ceding to the legislature the sole responsibility for controlling the taxation regime of court costs. *When taxing court costs courts must adhere strictly to legislative enactments.*[28]

¶ 8 It is this court's duty to obey the legislative cost-allocation scheme.[29] Section 978 very plainly prescribes that appellate costs be taxed in favor of the prevailing party. **It allows no exceptions for any class of litigation and leaves no room for judicial tinkering.**

## V

## TODAY'S PRONOUNCEMENT IS RETROACTIVE AND APPLIES TO THE PRESENT CASE

■ ¶ 9 The court need not, as the dissent counsels, apply today's ruling prospectively. Its past practice of taxing appellate costs in matrimonial disputes in strict conformity to the terms of § 978 has been followed uninterruptedly beyond the enactment of § 110D.[30] *Gilcrease* has never been adopted as a rule of practice. Because the norm we formally abolish today has long been in disuse,[31] we will not speculate that anyone would have harbored an expectation of reaping its benefits. Today's pronounce-

ment, a faithful exposition of the existing law on taxation of appellate costs in matrimonial disputes, does not alter the course of present-day law but merely excises from its body an aberrational growth of antiquarian jurisprudence long in *desuetude*.

## VI

## SUMMARY

¶ 10 In obedience to the provisions of § 978, which clearly **mandate** that appellate costs be taxed *de cursu* in favor of the prevailing party on reversal of a judgment, and to Rule 1.14a, which governs in-court procedure for the enforcement of that statute, the appellant's motion to tax appellate costs in her favor is granted. Any other ruling would be an open invitation to judicial dispensation of favors, a practice which has no place in the legislative regime of court-costs regulation. The costs taxed today shall be enforced by the trial court—after receiving this court's mandate—and their execution shall be dealt with in the same manner as if each item had been taxed below.

¶ 11 HODGES, LAVENDER, HARGRAVE, SUMMERS and BOUDREAU, JJ., concur.

¶ 12 WATT, C.J., and KAUGER and WINCHESTER, JJ., dissent.

KAUGER, J., with whom WATT, C.J. and WINCHESTER, J. join, dissenting to the supplemental opinion on rehearing:

¶ 1 The majority determines that appellate costs in matrimonial matters are automatically taxable against the prevailing party. To reach this result, the majority: 1) ignores principles of statutory construction insofar as 12 O.S.2001 § 978 [1] and 43 O.S.2001 § 110 [2]

---

**28.** *Howe, supra* note 19, at ¶ 0 syl. 1, at 404.

**29.** *Howe, supra* note 19, at ¶ 0 syl. 1, at 404.

**30.** *Chamberlin, supra* note 3, ¶ 11, at 726; *Jackson, supra* note 7, ¶ 22, at 429.

**31.** *See* Part II of this opinion.

**1.** Title 12 O.S.2001 § 978 provides:
"When a judgment or final order is reversed, the plaintiff in error shall recover his costs,

including the costs of the transcript of the proceedings, or case-made, filed with the petition in error; and when reversed in part and affirmed in part, costs shall be equally divided between the parties."

**2.** Title 43 O.S.2001 § 110 provides in pertinent part:
"... C. Upon granting a decree of divorce or separate maintenance, the court may require either party to pay such reasonable expenses of

are concerned; 2) overrules precedent specifically holding that this Court has the authority to divide appellate costs equitably; and 3) disregards the historical fact that matrimonial matters arise from chancery and are equitable in nature. Finally, an equitable division of costs would require nothing more than is already being done when trial courts determine the equitable division of attorney fees and expenses.

## I.

¶ 2 **TITLE 43 O.S.2001 § 110 IS LATER IN TIME THAN 12 O.S.2001 § 978 AND IS SPECIFICALLY APPLICABLE TO MATRIMONIAL PROCEEDINGS.**

¶ 3 Where two or more enactments relate to the same subject matter, this Court's primary objective is to determine the latest expression of the legislative will.[3] Under this rule of statutory construction, the most recent enactment will ordinarily prevail when there is an irreconcilable conflict between two statutes. When a special statute clearly includes the matter in controversy, the special statute controls over a statute of general applicability.[4] Finally, our goal when considering two apparently conflicting legislative enactments dealing with the same subject matter is to consider them together as a harmonious whole and to give effect to each provision.[5]

¶ 4 The Legislature first enacted the provision for the equitable division of expenses in divorce-related proceedings, 43 O.S.2001 § 110, in 1965. However, the language of 12

O.S.2001 § 978, allowing costs on appeal, has been a part of Oklahoma law since 1910. Section 110 deals specifically with matrimonial matters while § 978 addresses costs generally. While there is an apparent conflict between the provisions as it relates to costs, this conflict can be avoided by simply abiding by the established rules of statutory construction—giving effect to the most recent expression of the legislative will, and allowing the specific statute to control over the more general.

## II.

¶ 5 **BINDING PRECEDENT SUPPORTS THE EQUITABLE DIVISION OF COSTS.**

¶ 6 In 1936, almost thirty years before the Legislature allowed the equitable division of costs in a divorce proceeding, this Court held in syllabus three of *Gilcrease v. Gilcrease*, 1936 OK 50, ¶ 0, 54 P.2d 1056:

> "Notwithstanding the affirmance of the judgment of the trial court, this court may, in its discretion, tax the costs of appeal in a divorce proceeding against the prevailing party."

In decrying the efficacy of the *Gilcrease* opinion, the majority ignores well-settled law on another issue—a syllabus, authored by this Court, embodies the law.[6] The Court's language is not *ipse dixit*—the bare assertion of an individual.[7] Rather, it is the statement of this Court and is more akin to being carved in stone. We regularly rely upon

---

the other as may be just and proper under the circumstances.
D. The court may in its discretion make additional orders relative to the expenses of any such subsequent actions, including but not limited to writs of habeas corpus, brought by the parties or their attorneys, for the enforcement or modification of any interlocutory or final orders in the divorce action made for the benefit of either party or their respective attorneys."

3. *Public Serv. Co. of Oklahoma v. Northeastern Oklahoma Elec. Coop., Inc.*, 2002 OK 29, ¶ 14, 49 P.3d 80; *Grand River Dam Auth. v. State*, 1982 OK 60, ¶ 24, 645 P.2d 1011.

4. *Tulsa County Deputy Sheriff's Fraternal Order of Police, Lodge No. 188 v. Board of County*

*Comm'rs of Tulsa County*, 1998 OK 44, ¶ 13, 959 P.2d 979; *Carter v. City of Oklahoma City*, 1993 OK 134, ¶ 11, 862 P.2d 77; *State ex rel. Trimble v. City of Moore*, 1991 OK 97, ¶ 30, 818 P.2d 889.

5. *McNeill v. City of Tulsa*, 1998 OK 2, ¶ 9, 953 P.2d 329; *Abbott v. Board of Trustees of Oscar Rose, Etc.*, 1978 OK 129, ¶ 7, 586 P.2d 1098.

6. *Box v. State Election Bd. of Oklahoma*, 1974 OK 104, 526 P.2d 936; *Turner v. Rector*, 1975 OK 172, 544 P.2d 507; *Perforators v. Hilligoss*, 1964 OK 244, ¶ 38, 397 P.2d 113; *Eckels v. Traverse*, 1961 OK 139, ¶ 2, 362 P.2d 683. See also, *Short v. Jones*, 1980 OK 87, ¶ 3, 613 P.2d 452.

7. Black's Law Dictionary, 4th Ed. (1968).

syllabi as what they are—Oklahoma law as expressed by this Court.[8]

¶ 7 The majority can only reach the result here by overruling precedent. If *Gilcrease* is to be overruled, the change in the law should be given prospective application. When a statute or rule of law appears obscure in its impact on the case at bar, our pronouncements are given prospective effect to protect those who would otherwise suffer.[9]

¶ 8 Research does not reveal any cause subsequent to *Gilcrease* in which this Court has equitably divided costs. Nevertheless, the Court of Civil Appeals evidently did not consider the practice so "foreign" to Oklahoma practice. In *Bingham v. Bingham*, 1981 OK CIV APP 26, 629 P.2d 1297, the Court of Civil Appeals taxed the costs of the appeal equally between the parties.[10]

### III.

### ¶ 9 MATRIMONIAL SUITS ARE EQUITABLE IN NATURE.

¶ 10 The majority does not dispute that matrimonial suits are equitable in nature.[11] Nevertheless, by questionable statutory construction and only by overruling controlling precedent, it requires that, in the matter of taxing appellate costs, equity be taken out of the equation. The position is unsupported either by statute or by controlling precedent.

### IV.

### ¶ 11 NO ADDITIONAL BURDEN IS PRESENTED IF COSTS ON APPEAL ARE EQUITABLY DIVIDED.

¶ 12 Everyone agrees that the award of attorney fees and expenses never depends upon prevailing party status in matrimonial matters.[12] Where no compelling or overriding equitable considerations exist, husband and wives are each required to bear their own counsel fee obligations and litigation related expenses.[13] Where there is an equitable reason for a different division, the court may consider the financial means of the parties and whether frivolous claims were pursued.[14]

¶ 13 Attorney fees and costs go together like bread and butter or mashed potatoes and gravy. Once you have to consider the equities for the award of attorney fees and expenses as is mandated by 43 O.S.2001 § 110,[15] the trial court has made the precise determination required for the award of costs. Presumably, the equities would support the same award for costs as for counsel fees. Therefore, the equitable division of costs requires no mental exercise that is not already being done when attorney fees and costs are awarded.

**8.** *Lawton v. International Union of Police Ass'n,* 2002 OK 1, ¶ 9, 41 P.3d 371; *Chickasaw Telephone Co. v. Drabek,* 1996 OK 76, ¶ 7, 921 P.2d 333; *Goldman v. Goldman,* 1994 OK 111, ¶ 2, 883 P.2d 164.

**9.** When called upon to settle the meaning of not-so-readily intelligible or not-so-clearly settled legal norms that are a veritable trap for the unwary, the court will give its pronouncement purely prospective effect in order to save the parties from the unforeseen impact of an obscurely worded regime of rules. See, *McDaneld v. Lynn Hickey Dodge, Inc.,* 1999 OK 30, ¶ 1, 979 P.2d 252; *Bushert v. Hughes,* 1996 OK 21, ¶ 2, 912 P.2d 334; *Manning v. State ex rel. Dept. of Public Safety,* 1994 OK 62, ¶ 1, 876 P.2d 667; *Hale v. Board of Cty. Comm'rs of Seminole County,* 1979 OK 158, ¶ 4, 603 P.2d 761; *Poafpybitty v. Skelly Oil Co.,* 1964 OK 162, ¶ 19, 394 P.2d 515.

**10.** Opinions released by the Court of Civil Appeals are persuasive only. Rule 1.200(c)(2),

Rules of the Supreme Court, 12 O.S.2001 Ch. 15, App. 1.

**11.** *Moyers v. Moyers,* 1962 OK 146, ¶ 0, 372 P.2d 844; *Bouma v. Bouma,* 1968 OK 35, ¶ 0, 439 P.2d 198.

**12.** *Kerby v. Kerby,* 2002 OK 91, ¶ 13, 60 P.3d 1038; *Thielenhaus v. Thielenhaus,* 1995 OK 5, ¶ 19, 890 P.2d 925; *Harmon v. Harmon,* 1983 OK 89, ¶ 19, 770 P.2d 1.

**13.** *Daniel v. Daniel,* 2001 OK 117, ¶ 24, 42 P.3d 863; *Larman v. Larman,* 1999 OK 83, ¶ 18, 991 P.2d 536.

**14.** *Kerby v. Kerby,* see note 12, supra; *Casey v. Casey,* 2002 OK 70, ¶ 26, 58 P.3d 763; *Abbott v. Abbott,* 2001 OK 31, ¶ 12, 25 P.3d 291.

**15.** Title 43 O.S.2001 § 110, see note 2, supra.